F. S. NELSON, Appellant, v. S. M. HAMILTON, Appellee.

No. 41227.

FEBRUARY 16, 1932.

Percival & Wilkinson, for appellant.

C. E. Hamilton and C. A. Robbins, for appellee.

STEVENS, J.—This action, predicated upon two instruments of guaranty, identical in substance and purpose, grows out of the sale of sixty-five shares of the capital stock of the First National Bank of Winterset, Iowa. The original contract of sale which was executed September 2, 1921, preceded the execution of the instruments of guaranty but was contemplated thereby. By the terms of this contract, appellee agreed to convey sixty-five shares of the capital stock of said bank to appellant at book value on said date, plus a premium of $20.00 per share. The contract provided for the transfer of the stock as follows: October 1st, 1921, forty shares; April 1st, 1922, twenty-five shares. This contract also contained the following provisions:

"It is also further agreed, understood, and part of the effect of this contract, that said bank is known to have as part of its assets, bills receivable that are bad paper, slow and of doubtful character. The above bills receivable are to be thor-

oughly gone over and an earnest effort made to collect in all such bills receivable and ascertain the true value of said bills receivable to the bank as are permitted by the National Banking laws, and when such amount is ascertained, the amount found to be uncollectible and worthless, or not permitted by the National Banking Department to be charged off by said bank.''

Transfer of the stock was made on the dates fixed by the contract. Identical instruments of guaranty were duly executed and signed by appellee on each of these respective dates. The following portion of the aforesaid instruments is material and necessary to the determination of the question before the court on this appeal:

''I hereby agree that for value received, I will guarantee to said F. S. Nelson any loss on said stock in any event whatsoever caused by the Bank sustaining loss on any loan or loans, overdrafts, shortages or obligations of or to the bank in any manner that exist on the date of transfer of said stock, said losses being charged to the earnings of the bank current or surplus or by assessment of the stockholders. Payments made on this guaranty will be made at the time loss is sustained by the bank. Renewals or extension of time when authorized or approved by the Board of Directors of the Bank will be considered as the original obligation and loss sustained thereon under this guaranty.''

Endorsed upon each of the instruments of guaranty is the following:

''Credit is given on the within guaranty for an allowance of $20,000.00 from surplus item of $40,000.00 as losses to the bank, in the purchase price as per contract of sale.''

The right of appellant to maintain a cause of action is dependent wholly upon the construction of these several instruments. What is the full scope and effect of the obligations assumed by the guarantor? The purchase price of the stock fixed by the contract of sale was the book value plus $20.00 premium of the shares of stock on the date of transfer. The contract by its terms evidences assets and bills receivable that are bad, slow and of a doubtful character. The agreement of the parties was

to go over the assets and bills receivable of the bank thoroughly and to make an earnest effort to collect in all such bills receivable and to ascertain the true value thereof and also to determine what amount then would be permitted, by the national banking laws, to be carried by the bank. Upon ascertainment of the bills receivable that are uncollectible and worthless, the same was to be charged off, and the purchaser credited upon the agreed book value of the shares on the basis of depreciation thereon as thus determined.

An exhibit introduced in evidence shows bills receivable found to be uncollectible or worthless aggregating $24,744.70. Credit allowed upon the purchase price as shown by the endorsement thereon was on the basis of a depreciation of $20,-000.00 in the book value of the stock. No evidence was introduced in this case to prove the character of the bills receivable which caused the depreciation in the stock complained of. So far as the record shows, all such have been worth 100%. The proof does, however, show that each and all of the instruments involved herein were bills receivable owned by the bank at the time the certificates of stock were transferred or renewals thereof. Do the instruments of guaranty, when construed in the light of the contract of sale, bind the guarantor to maintain the book value of the stock as of the date of transfer, or was it the intention of the parties that he would protect the purchaser against depreciation and loss in the book value of the stock resulting only from such bills receivable as were in the original contract classified as bad, slow and of doubtful character?

The trial court was of the opinion that it was the intention of the parties to cover only such loss as resulted from the specifically designated class of obligations. We are constrained to the opposite conclusión. The reference to bad, slow and doubtful paper is not in any direct manner coupled with the guaranty, nor is the language thereof or its equivalent repeated therein. The language of the instruments of guaranty signed by the guarantor is very specific and definite. It guarantees the purchaser against any loss on the certificates of stock in any event whatsoever resulting from any loan, loans, overdrafts, shortages or obligations of, or to, the bank, held by the bank or existing on October 1st, 1921. Payments of losses are to be made at the time the loss is sustained by the bank. The instru-

1234

ments further specifically cover renewals and extensions in time of payment of bills receivable when authorized or approved by the board of directors. It would have been difficult for the parties to have employed language more clearly expressive of the obligation assumed. It must be assumed that the credit allowed on account of bad, slow and doubtful paper at the time the certificates were transferred included all paper of that description then known to be in the bank. Subsequent possible losses were, however, fully provided for by the instruments signed. Numerous losses occurring subsequent to the transfer of the certificates were, in fact, promptly made good by the guarantor from time to time as they occurred. The losses thus made good involved thirty-five notes covering a period from July 21, 1924, to August 19, 1929. The parties themselves, therefore, have placed their own construction upon the instruments. There is apparently no escape from the conclusion that appellee bound himself to protect appellant against loss or depreciation in the book value of the stock resulting from overdrafts, shortages or obligations of, or to, the bank, existing on October 1st, 1921, and on all bills receivable then held by the bank.

This is the only question passed upon by the trial court. Appellee has argued other matters of defense. They were not passed upon by the trial court. We shall not now consider or determine these questions.

It follows that the judgment must be and it is reversed.— Reversed.

WAGNER, C. J., and FAVILLE, DE GRAFF, and ALBERT, JJ., concur.